The attorneys approach the podium. Tell us who you are, who you represent, and about how much time you think you need. My name is Christopher Copez. I represent the defendant, Nicholas Gutierrez. Maybe 15 minutes, and then reserving some time for rebuttal within that. We do have multiple cases up today, and we'll keep you to as short a time as you can go. Assistant State's Attorney Jessica Ball, on behalf of the people, I would also ask for 15 minutes. We know the facts. We read your briefs. I suggest that you stick to what you consider your strongest points, and we will not hesitate to question you. Thank you. Proceed. May it please the Court. Again, my name is Christopher Copez, and I represent the defendant, Nicholas Gutierrez. Today I'd like to focus my arguments on Issue 2, that's the sexual assault issue, as well as Issue 5, the Batson issue. With respect to the sexual assault issue, in this case, Nicholas Gutierrez was charged with aggravated criminal sexual assault after swabs taken during the autopsy of the victim revealed the presence of semen. The medical examiner, however, testified at trial that none of the usual indicators of a sexual assault were present in this case. There were no signs of bleeding, tearing, or bruising to the genital area. There were no injuries to the breast area. The victim's clothes were not torn or ripped. There was semen in the rectum and vagina. Correct. Defendant's semen, is that correct? Correct. In the underwear, I believe. I'm sorry? Go ahead. Okay. Excuse me, before you go ahead, if I could, counsel, you said there was no evidence from the medical examiner that this was a sexual assault? None of the usual indicators of a sexual assault were present in this case. Okay. So the rib fractures, the bruise to her groin, those were consistent with sexual assault, weren't they? Those would possibly be consistent with a sexual assault, but it's not a usual indicator of a sexual assault. It's also very consistent with the victim being pinned to the ground for the purpose of strangling or stabbing, both of which occurred in this case. Proceed. As I said, the victim's clothes were not ripped or torn. The defendant's own statement made no mention of any sexual acts taking place here. And so in a case like this where the evidence raises the inference that any sexual acts occurred after the victim's death, this Court should hold that the State is required to prove beyond a reasonable doubt that the victim was alive at the time of the sexual acts. And there's sort of two reasons for this. One is the nature of the crime of criminal sexual assault itself, that it requires a living victim. Excuse me, counsel, just again, so I can be really clear here. Sure. The argument is here that she was dead when the sexual assault took place, therefore there was no sexual assault. Correct. And also... You don't have gain further explanation. Keep going. Okay. But I'd also like to point out that the jury also was not instructed on this issue. So this Court could find that the State failed to prove it beyond a reasonable doubt or that the trial court erred in refusing the instruction that defense counsel offered on this issue. And so the source of this is sort of the nature of the crime of sexual assault itself, and that it requires a living victim. Criminal sexual assault is in the bodily harm... You said there are no indications of force. Is that what you say? A sexual assault. Now, say if the person was dead in a week, would that change things? If they were dead in a week? Week. In other words, I'm getting to his person, this person probably was dead within an hour. Wouldn't there still be some sort of stretching or some marks on the individual indicating it was forced? There could be. And here we had none of that, which, again, lends support to our argument that... You're not arguing that it was consensual? No. The evidence here suggests that where there was such a particularly violent death, if there were a sexual assault that occurred while the victim was alive, surely there would be some sort of injuries to the victim's genitalia or some sort of indicator of a sexual assault. Just to reiterate, you're not arguing that he did not kill her? Correct. We're not arguing the sufficiency of the evidence on the murder. And you're not arguing that he did not have sex with her? Or the body? We're arguing that the state failed to prove that the sexual acts occurred before the death. So we can see that there's the presence of semen there, but we dispute whether that amounts to criminal sexual assault in Illinois. Before we say there's a bright line, which is the word we used in... In Hendricks, I believe. Hendricks, thank you. Indeed. So if we were to adopt that bright line, that would be in spite of Hendricks, in spite of Fisher, in spite of Colley, of our court, the Illinois Appellate Court, having ruled on murder cases involving rape, that there is no bright line. And why shouldn't we then adopt the course of conduct cases from our Supreme Court, which have found to be the eligible course of conduct in these cases, felony murder cases? This was a felony murder, wasn't it? It was charged. One of the theories. One of the theories, correct. So in Thomas, our Supreme Court applied course of conduct to arson. In Nitz, they applied it to aggravated kidnapping and robbery. In Andersen or Armstrong, they applied it to armed robbery. In Hampton, they applied it to armed robbery. In Richardson, they applied it to armed robbery. In Flores, they applied it to armed robbery. In Ramirez, they applied it to armed robbery. Why shouldn't we adopt it? Course of conduct. That's a good question. And the reason is that... Thank you. Felony murder, everything that you've talked about involves principles of felony murder. But felony murder is only applicable where the defendant is guilty of the underlying felony in the first place. And so if the defendant isn't guilty of the underlying felony, in this case criminal sexual assault, then felony murder couldn't apply. But in every case I just read you, the argument was, as shocking this is to anybody in this line of work, of criminal work, is the argument was that I killed a person, no question I killed a person, and then I had sex with a dead body. And so having been taught as a trial lawyer, why don't you run your arguments by your family sometime at dinner to see if it's rational. You don't want to bring this up at the Thanksgiving dinner table. Hey, I got an argument. My client killed a lady, and then he had sex with a body. Will that fly? No, you're going to hear... Having been in front of lots of juries where you're... It's never good for the defense. And so here, they rejected, that's been rejected at least 12 times, or 10 times, in reported cases. Why don't we just say it for aggravated criminal sexual assault in felony murder cases for all time, just to clear it up. Well, the reason is that criminal sexual assault is a unique offense, different from sort of a property offense. Here, the very nature of the crime requires a living victim. You know, who says? It goes back to the course of conduct. And going back to Justice Murphy's question, this fellow lived in a nursing home. And so it wasn't like this lady was dead or came in as a cadaver and they're cleaning up the body as funeral homes do to prepare the body for a funeral. He had sex with a dead body. He murdered this person. And the argument is, yeah, he murdered her. No question. He broke her 10 ribs. He stabbed her 15 times. He strangled her. He tied her up, which would be odd if she's still alive. Why would you need to tie her up with the sheep, as Troy points out? Normally you tie up the live people. You don't tie up dead people. So why should we say that rape, you have to be alive? What's your best case for that proposition? Well, the other point I'd like to make as far as that is that the crime of criminal sexual assault requires the element of force or some lack of consent. Well, so is armed robbery. So is aggravated kidnapping. Correct. But the use of force should be, you know, the definition of criminal sexual assault is if he commits an act of sexual penetration by the use or threat of force. And so where the force is not concomitant with the act of sexual penetration, it doesn't amount to criminal sexual assault. But, counsel, you're saying that the force, this whole event was an act of force. I mean, by dragging her to the place by her hair. I mean, force was involved. It didn't even have to be force right then when you penetrated her. It just had to be force in the whole act. And, I mean, as it states, you know, it's clear. Medical evidence isn't always required to prove every part of sexual assault. Right? That's true. But there should be, you know, our argument is that there should be some evidence to show that the victim was alive. It doesn't necessarily have to be medical evidence. There's no evidence to show otherwise. I mean, it's just your client's, your argument that she was dead. And, I mean, just because there's no force in the vaginal area, this is a woman who had four children. And the medical examiner said it. There may not be any tear. I mean, four children, 71 years old. I mean. Correct. But it's certainly unusual. I mean, looking at what happened here, it's certainly unusual that in light of the violent way in which the victim died, that there would be no injuries whatsoever or no, you know, torn clothing. There's really no evidence of the sexual assault. Who's to say she wasn't passed out when it happened? Who's to say she wasn't just unconscious, wasn't dead? And that's, you know, an inference that could be raised from the record. But, again, we don't think that it's enough to be proven beyond a reasonable doubt. And nor do we, you know, defense counsel also sought to bring this issue for the jury and an instruction on this was denied. Well, that's what happened in Isler, right, where Mr. Isler, after he had sex with the young male prostitutes, he cut them into little pieces. And he argued that. And the jury came back, after not having been instructed that the 15-year-old had to be alive when he was cut and being raped by Mr. Isler, our Supreme Court rejected the idea of instructing on that, that there had to be a separate instruction. And it would be a non-IPI instruction, right? Yes. Okay. And here, you know. Let me ask you. Sure. If we adopted the line of cases, McLaughlin cases, wouldn't it put an end to all this, one way or the other? I'm not saying which side of McLaughlin. Yeah, I believe that would put an end to it. Yeah, I believe that that would put an end to it. Why shouldn't we adopt McLaughlin? Again, because I think that the felony murder principles are separate from whether or not the defendant is guilty of the underlying crime. So the course of conduct, you're just, you say that should never be accepted. Well, correct. In this case, I mean, in cases like this, where there's. . . We started the felony, and this was during the felony. Someone was murdered, we should say no. For the crime of criminal sexual assault, yes. Because of the very nature of the crime, you know, it's more than just. . . But it leaves very long-lasting physical, you know, psychological effects upon the victims. And so that's, you know, sort of the very nature of the crime. Do we encourage people to kill victims? No, I don't. I mean. . . We could go in there, shoot the guy in the drugstore, and just take the money and call it a theft. No, I think. . . I mean, we're certainly not. . . The defendant, you know, really does himself no favors by committing a murder. So I don't think. . . Under your argument, he wouldn't. He'd just get murdered. And it wouldn't be a felony murder because he's dead. Right, but it would be a murder with a sentence of 20 to 60 years. But then he couldn't be killed. So he does help himself. He avoids the possibility of a natural life sentence or a death sentence by killing the victim. So it would encourage rapists to kill their victims first, then rape them. Right? Right, but I mean. . . If you believe in the idea of not. . . the death penalty is a good thing, but if you believe in the idea of deterrence being a good thing, which are laws based on. So then to say if you murder the victim first, then commit the armed robbery, the burglary, the aggravated kidnapping, the rape, that's okay. You can't get death. That's what we'd be saying. And it's Justice Murphy's question is, is that a good thing? Why would we do such a thing? Well, you know, criminal sexual assault is a lower offense than murder, and so it seems somewhat problematic to suggest that the defendant has an incentive to commit a greater felony to cover up a lesser felony. That's why they do it, though, right? That's why he did it. Why else would you? I'm sorry. Do you want to go on to your next point? Yeah, sure. With respect to the Batson issue. The what issue? The Batson issue. That's issue five in the brief. Gutierrez established a prima facie case of racial discrimination in the jury selection where the state, near the end of jury selection, used four peremptories in a row to strike African-Americans from the jury. At the prima facie case, at the prima facie stage, the defendant doesn't have to prove that the state did, in fact, discriminate. He only needs to prove that there's some evidence from which to infer discrimination. And here, Gutierrez met that standard. At the start of the selection for the 11th juror, the proportion of African-Americans in the jury was about equal to the level in the veneer. The state had only used three of its available 14 peremptories at that time and then used one, two, three, and a fourth. Let me make sure I understand. There were four of seven were African-American. Of the peremptories that the state used? They started out with 39, 21 white, 11 African-American, six Hispanic, one Asian, and the final, which comes up to percentages, 53, 28, 15, and 2.6. The final was six Caucasians, 50% as opposed to 53% Caucasians, four African-Americans, turned out to be 28.2 as opposed to 28, one Hispanic, which turned out to be 15 as opposed to 15, one Asian, which is 2.6 as opposed to 2.6. I guess that's even. So when we come down to the end, just looking at percentages and the fact that they had African-Americans on, wouldn't that sort of defeat your argument? No. I mean, again, the defense needs only raise the inference of discrimination, so the presence of African-Americans on the jury doesn't negate that inference by itself. The state, having a lot of peremptories to burn, used every single one of its peremptories to strike African-Americans. Four out of seven, right? Right. At the end of, right. Four in a row. Yes. Wasn't the focus on the end or the last, the second day of the jury selection? I mean, the argument doesn't seem like it was taking into account the entire process. Right, but it doesn't need to take into the entire process. I mean, we have to look at all relevant circumstances. True. But, you know, even one juror struck in a racially discriminatory manner can suffice to show at least a prima facie case. How does one juror establish a pattern, counsel? I believe the Supreme Court has held that one, you know, you only, one can show a pattern. And we didn't have one. We have four. I believe what they said is if for bad motives, throwing off the person based on their race any time is bad. Yes. But they don't say it's a prima facie case. So in the three-step process, one will not get you a hearing on prima facie. But if, think of it from the end of a judge writing this stuff, how could you write it any other way than the way the Supreme Court has addressed it? It's okay to throw off a black person because they're black? If you only do it once or twice? No, we have to write it. You can never do that, ever. That does not, however, get you to a prima facie case. In this case, at the time the state threw off four African Americans in succession, they already accepted four out of the first eight jurors accepted by the state were black. Is that correct? Yes. Indeed, at page 51 of your brief, you say, contrary to the court's ruling, the defense counsel raised at least the inference of purposeful racial discrimination where the state made repeated use of its peremptory challenges, and I love this, to prevent a disproportionate number of African Americans on the jury. So do you have a case, can you cite a case in the U.S. Supreme Court or Illinois Supreme Court where there was a higher number of blacks on the petite jury, the jury actually heard the case, than there was in the veneer, and yet they still held Batson to be violent? No, and again, no, I don't have a case for that proposition. But again, we're not arguing that Batson itself, that the state did in fact discriminate. The prima facie case is a very low threshold. You only need to have some evidence from which you can infer discrimination. Well, you look at the six factors, or seven, however many there are. Right. But here, generally, I mean, it's a great argument. I like it. I mean, you're bringing forth right. You're not being sneaky at all. You know what, we wanted more blacks on there than there were in the veneer. I mean, proportionally. And we should, as a court of review, write an opinion saying that even when the state accepts, in this case, about 6% more blacks on the petite jury than were available in the veneer, they can still violate Batson. And why should we do that again? Looking at those factors, I mean, this Court is bound to look at the factors that the Supreme Court has identified which raise an inference of discrimination. Here, arguably, four clearly raises a pattern of discrimination. Another point is that the African-American prospective jurors who were struck shared really no characteristics other than their race. But we don't get to that point until we see a reached prima facie case, right? No, I disagree. That's part of the one of the seven factors in reviewing the prima facie case, is whether or not there's the pattern, whether or not they share other characteristics. Here, there were no characteristics other than their race that these four shared. They had different marital status, different jobs. They all said that they could be fair and apply the law. The state didn't try to challenge any of them for cause. There was really nothing that distinguished them from other jurors that the state struck. And so that is a very powerful factor in this case that shows a prima facie case. And again, the state has, you know, regardless of what happened, you know, prior, it's never, it's always a violation of the Constitution to discriminate in jury selection. And so the mere fact that, in fact, actually, I do have a case, Kindlin, out of this court, in which, I believe it's cited in the brief. Is what? Kindlin? Yeah. And the court said there that the mere fact there were equal numbers in the veneer in the jury didn't negate the evidence of discrimination in that case. Okay. I'll lift that up. But again, coming in from our side of writing these things, certainly we could not say that once the state, once the jury has an identical or higher proportion of blacks or African-Americans than in the veneer, it's okay to throw out every single black after that. Because if we said that, we'd see that happen, frankly. As soon as we said, well, you got your four, throw the rest of them off, it's not going to violate Batson. Frankly, after a jury got to four blacks on it, we'd see lots of them being thrown off by the state. Just as we saw the defense throw off six whites out of six. You know, they used all six of their six bullets were used against white people in a clear effort to racially steer the jury to what they thought was preferable for them. I don't know that that's true. I mean, the state was certainly. How do you not know when six out of six is not worse than four out of seven? How is it you don't know that? Because the state didn't lodge its own Batson challenge. I mean, the state could have raised a Batson challenge. They generally don't. I'm sorry? They generally don't. But they certainly are free to. It's equally unconstitutional for the defense to. Theoretically. Have you ever seen a case? Ed Fiala did it twice and got reversed both times. But it is unconstitutional for either party to discriminate on the basis of race. Yes. And so the defense can, if the defense had done that by striking white jurors, then the state's attorney was certainly free to argue Batson challenges. And the state agreed? The judge went in reverse in about two minutes? But again, you have to look at all of the factors here. It's not just a comparison of numbers. So even though the numbers are certainly one part of it, but for the prima facie case, it's a low threshold in which you look at a number of factors. And at that point, the burden shifts to the state to provide its race-neutral reasons. And so here, the trial court's statement, you know, that the defense was not looking at the entire jury selection process, entirely failed to consider his argument that these four jurors were racially discriminated against. Okay. I'd like to reserve a couple minutes for rebuttal. Pardon? I'd like to reserve a couple minutes. Thank you. Briefly? Yes, sir. Good morning, Your Honors. First, it cannot go unnoticed that the defendant committed a vicious attack against a church-going 51-year-old woman. What does it have to do with this case? I mean, that goes to his first argument, which he has not argued about, okay, that he doesn't deserve natural life. The facts of the case are why we're here today, Judge. The fact she went to church made it less likely that when he stabbed her four times, strangled her and beat her, that it was more likely to be right because she went to church? No, Your Honor, but he did beat and stab her until he was physically exhausted. He sure did. And he broke 10 of her ribs and stabbed her 11 times. What I think we're getting to is what I said to begin with. We've read the facts. We've read the briefs. Let's resume with the argument. We know how terrible the facts are in this case. Let's get to responding to his argument. Thank you. With respect to the aggravated criminal sexual assault, the State's position is that this Honorable Court does not need to get to the legal question of whether the State has the burden of proving that a rape-murder victim was alive at the time of the penetration because, in this case, the evidence overwhelmingly showed that Mary was alive at that time. The expert testimony alone defeats the defendant's argument. The medical examiner testified. But she wasn't in any way able to consent. She was. She was against her will. She was absolutely against her will. It was forcibly done. And the medical examiner's testimony proves that all of the injuries, except for the strangulation, occurred prior to her death. The medical examiner, in fact, testified that it was more likely she was alive at the time the sexual assault occurred given how her body was tied with the sheet and that strangulation with the sheet was the last act and ultimate cause of death. The bruising to her elbows and pelvis, the stab wounds, and the rib fractures all occurred prior to her death. Counsel, you just used the term more likely. Is that enough to raise it to the standard, the burden of the State? Well, the State's position first is that there's no burden that the State has to prove that she was alive at the time. But the evidence here does show that she was. And looking at all of the evidence in the light most favorable to the prosecution, the only reasonable inference that can be drawn from the evidence is that she was, in fact, alive at that time. The medical examiner's testimony proves that. The physical evidence also defeats the defendant's argument. What about following the lying cases of McLaughlin? What's your argument? With respect to the ongoing criminal assault rule? If this Court gets to that legal issue, the people maintain that it does not bear the burden of proving that the victim, a rape-murder victim, was alive at the time. It follows the Hendricks, what this Honorable Court held in Hendricks, where there was a 71-year-old rape-murder victim with the same similar facts. The defendant argued the same thing, and this Court said we will not draw a bright line. It rejected the bright-line approach and said we would not require the State in all similar cases to establish the precise time of death in order to prove a sexual assault upon a murder victim. That's the ongoing criminal assault rule. It is rape where the defendant both kills and sexually assaults his victim in a single continuous act or in a series of closely related acts, even if penetration occurs after the victim dies. That's because the force element of active sex assault is satisfied even if the force causes the victim's death prior to the penetration. The penetration occurs or is accomplished because of the defendant's use of force. Under that rule, the State is only required to prove that the victim was alive when the series of assaults began. And we did that here. There's no question that Mary was alive at the time the assault began. It started when the defendant grabbed her by her hair and pulled her into his apartment, punched her in the face, and knocked her to the ground. And the assault didn't end until he choked the life out of her and threw her bloodied, beaten, lifeless body under the floorboards of his apartment. So the proper question is not whether the sex act occurred after the victim was dead, but whether the murder and the rape formed a continuous chain of events. Here, the facts demonstrate that the assaults to her upper body and to her head were all related to the assaults on her lower body. The injuries to her upper body demonstrate that force was used in getting her to submit to those sexual acts. And in this case, we also have unity in time and location. This all occurred within a short period of time in the defendant's apartment. There's no doubt here that it was one continuous act. With respect to the issue of Batson, there are three steps. And first, the defendant has to establish a prima facie case of racial discrimination. He didn't do that here. All seven factors supports the trial court's ruling. The trial court was there and observed the entire jury selection process. He observed all of the jurors, and his decision was not against the manifest weight of the evidence. In order to get past Stage 1, the defendant has to make a prima facie showing that the state's challenges were racially motivated. And he didn't do that. To make it beyond Stage 1, he would have had to produce enough evidence to allow the trial court to draw an inference that discrimination occurred. And he failed to do that. And it's true. The racially motivated removal of just one juror is bad, but that's not what we have here. None of the strikes were racially motivated. How do we know that? There's no evidence. None of the seven factors support the defendant's argument that they were racially motivated. In the end, the trial court adhered to Batson, followed those rules, and his decision is not clearly erroneous. If this ‑‑ If I can make a point before you sit down. I mentioned this about a decade ago, and I hadn't seen a case cited in a long time. 45 of your briefs, you say People v. Jimmerson, with a well-known fact, a corollary of law, that reviewing courts don't start at the beginning. You know, presumptions cut against the defendant. I asked 10 years ago to quit citing Jimmerson, since Jimmerson was given death, a sentence of death, and it was later shown he didn't do it. So when you cite cases for the proposition we should always affirm, which is the law generally, don't say the guy didn't do it. There's plenty of other guys who did do it whose names you could cite. Thank you. Thank you. If there are no other questions, the People would rest on its brief. And in closing, the People would respectfully request this Honorable Court to affirm the defendant's convictions and sentences for first‑degree murder, aggravated criminal sexual assault, burglary, and concealment of a homicidal theft. Thank you. Thank you. Counsel. Thank you, Your Honor. Briefly with respect to the Batson issue, the State really offers nothing to show that the strikes to defeat the defendant's inference of racial discrimination. So, again, we'd ask you to apply those factors, many of which weigh in the defendant's favor. And, indeed, the striking of four jurors in a row suggests a pattern of discrimination. With respect to the sexual assault issue, the State's attorney argues, or points to testimony from the medical examiner, that it's more likely than not that the victim was alive at the time of the sexual assault. What she's pointing to, however, is evidence that came out at the eligibility hearing. And at that same hearing, the medical examiner testified that it was more likely than not that the absence of injuries to the genital area was because the victim was not alive at the time of the sexual acts. And so I'd ask the Court to consider that as well. And then with respect to Hendricks, we're not asking the Court to rule as in Hendricks, to require the State to prove the precise time of death. What we're asking to do is, in cases where there's an inference that the victim was not alive at the time of the sexual acts, to either give the jury an instruction and offer them the chance to decide that issue, or for the Court to examine the inferences, and if it doesn't rise to proof beyond a reasonable doubt, to reverse. And with that, we'd ask the Court to reverse and remand for a new trial, or grant any of the other relief in our opening or supplemental brief. Thank you. Thank you. Thank you. The Court will take this case under advisement.